**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

GREGORY SHAW,                          )
                                       )
                    Plaintiff,         )
                                       )
          v.                           )          1:20CV581
                                       )
KILOLO KIJAKAZI,                       )
Acting Commissioner of                 )
Social Security,                       )
                                       )
                    Defendant.[1]      )

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Gregory Shaw, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Supplemental Security Income ("SSI"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 10 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 12, 14; see also Docket Entry 13 (Plaintiff's Memorandum); Docket Entry 15 (Defendant's Memorandum)). For the reasons that follow, the Court should enter judgment for Defendant.

---

[1] President Joseph R. Biden, Jr., appointed Kilolo Kijakazi as the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew M. Saul as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## I.  PROCEDURAL HISTORY

Plaintiff applied for SSI, alleging a disability onset date of November 19, 2015. (Tr. 233-38.)  Upon denial of that application initially (Tr. 108-22, 146-54) and on reconsideration (Tr. 123-39, 158-67), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 168-70).  Plaintiff, his attorney, and a vocational expert ("VE") attended the hearing (Tr. 47-81), during which Plaintiff amended his onset date to March 30, 2017, the protective filing date of his application for SSI (Tr. 10, 50-51, 255).  The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act.  (Tr. 7-20.)  The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 229-32), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings:

> 1.  [Plaintiff] has not engaged in substantial gainful activity since March 30, 2017, the application date.
>
> . . .
>
> 2.  [Plaintiff] has the following severe impairments: right shoulder degenerative changes; degenerative disc disease; scoliosis; sciatica; diabetes mellitus; insomnia; chronic pain syndrome; obesity; depressive disorder; and substance abuse.
>
> . . .
>
> 3.  [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals

2

the severity of one of the listed impairments in 20 CFR
Part 404, Subpart P, Appendix 1.

. . .

4. . . . [Plaintiff] has the residual functional
capacity to perform light work . . . except he can
stand/walk about [f]our hours in an eight-hour workday
with normal breaks; occasionally push/pull and operate
foot controls with the left lower extremity; occasionally
climb ramps or stairs; never climb ladders, ropes or
scaffolds; occasionally balance, stoop, kneel, crouch,
and crawl; frequently reach with the right upper
extremity; occasionally reach overhead with the right
upper extremity; and have occasional exposure to
unprotected heights, hazardous machinery or hazardous
moving mechanical parts. [Plaintiff] is limited to jobs
that can be performed while using a handheld assistive
device, a cane, required at all times when walking and
the contralateral upper extremity could be used to lift
and carry up to exertional limits. His work is limited
to simple, routine and repetitive tasks but not at a
production rate pace; simple work-related decisions;
occasional interaction with the public; and frequent
interaction with co-workers and supervisors. [Plaintiff]
would be off-task no more than ten percent of the time in
an eight-hour workday, in addition to normal breaks (with
normal breaks defined as a fifteen-minute morning and
afternoon break and a thirty-minute lunch break).

. . .

5. [Plaintiff] has no past relevant work.

. . .

9. Considering [Plaintiff]'s age, education, work
experience, and residual functional capacity, there are
jobs that exist in significant numbers in the national
economy that [he] can perform.

. . .

10. [Plaintiff] has not been under a disability, as
defined in the . . . Act, since March 30, 2017, the date
the application was filed.

(Tr. 12-20 (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

## A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted). "If there is evidence to justify a

4

refusal to direct a verdict were the case before a jury, then there is substantial evidence." <u>Hunter</u>, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." <u>Mastro</u>, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." <u>Id.</u> at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" <u>id.</u>

(quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." <u>Id.</u> "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." <u>Id.</u>

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' *i.e.*, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the [RFC] to (4) perform [the claimant's] past work or (5) any other work." <u>Albright v. Commissioner of the Soc. Sec. Admin.</u>, 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is

---

[2] The Act "comprises two disability benefits programs. The Disability Insurance Benefits Program provides benefits to disabled persons who have contributed to the program while employed. [SSI] provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." <u>Craig</u>, 76 F.3d at 589 n.1 (internal citations omitted).

[3] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." <u>Hunter</u>, 993 F.2d at 35 (internal citations omitted).

engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. See id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

## B. Assignments of Error

Plaintiff argues that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ err[ed] in finding that [Plaintiff] could perform [simple, routine, and repetitive tasks ('SRRTs')] but not at a 'production rate pace,' because the term 'production rate pace' is undefined either in law or in the ALJ decision itself" (Docket Entry 13 at 10);

2) "[t]he ALJ err[ed] in finding that [Plaintiff] would be off task no more than 'ten percent of the time in an eight-hour workday, in addition to normal breaks,' because the ALJ fail[ed] to explain what evidence support[ed] the off task limitation to no more than ten percent of the time" (id. at 15); and

---

[5] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

3) "[t]he ALJ err[ed] by failing to make a function-by-function assessment of [Plaintiff]'s functioning before finding [RFC]" (id. at 17).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (Docket Entry 15 at 4-22.)

## 1. Production Rate Pace

In Plaintiff's first assignment of error, he maintains that "[t]he ALJ err[ed] in finding that [Plaintiff] could perform SRRTs but not at a 'production rate pace,' because the term 'production rate pace' is undefined either in law or in the ALJ decision itself." (Docket Entry 13 at 10.) More specifically, Plaintiff contends that the United States Court of Appeals for the Fourth Circuit has "concluded 'while the ALJ stated that [the plaintiff] could not perform work requiring a production rate or demand pace, she did not give us enough information to understand what those terms mean.'" (Id. at 11 (quoting Thomas v. Berryhill, 916 F.3d 307, 312 (4th Cir. 2019) (internal quotation marks omitted)).) Plaintiff further asserts that the Fourth Circuit provided "four reasons" why the ALJ's "'analysis of [the plaintiff]'s RFC contain[ed] too little logical explanation for [the court] to conduct meaningful appellate review'" (id. (quoting Thomas, 916 F.3d at 312)), and that "all four of th[o]se conditions" exist in the instant case (id. at 15; see also id. at 12-15 (explaining how, in Plaintiff's view, all four problem areas identified in Thomas

9

exist in his case)), requiring "remand[] for a new hearing and decision" (id. at 15). Those assertions entitle Plaintiff to no relief.

In Thomas, the Fourth Circuit noted "four flaws in the ALJ's analysis" of the plaintiff's RFC:

> First, the ALJ drew no explicit conclusions about how [the plaintiff]'s mental limitations affect her ability to perform job-related tasks for a full workday — a benchmark established by the [SSA]'s own regulations.
>
> Second, the ALJ did not sufficiently explain how she weighed significant evidence related to [the plaintiff]'s mental-health treatment. The ALJ accurately stated that "the record . . . includes numerous findings of normal mood and affect or normal mental status examinations," but she omitted that those findings — at least, those she cites — were made by physicians treating [the plaintiff]'s chronic foot pain. There is no way for us to know whether, or why, the ALJ gave those findings the same weight as inconsistent findings made by Dr. Ida Richmond, a licensed psychologist who evaluated [the plaintiff]. Similarly, the ALJ did not say why she declined to discuss [the plaintiff]'s record of mental-health evaluations at Bridge Builders Family and Youth Services. To be sure, there is no rigid requirement that the ALJ specifically refer to every piece of evidence in her decision. But here, the ALJ chose not to discuss what appears to be a substantial portion of the record relating to [the plaintiff]'s treatment by mental-health specialists, even while citing curt mental-health notes made by doctors treating [the plaintiff]'s foot ailment. Right or wrong, that decision warrants some explanation.
>
> Third, the ALJ expressed [the plaintiff's] RFC first and only then concluded that the limitations caused by her impairments were consistent with that RFC. Stating a claimant's RFC before conducting a function-by-function analysis is an error — even though, on its own, it does not necessarily require remand.
>
> Fourth, while the ALJ stated that [the plaintiff] could not perform work "requiring a production rate or demand

pace," she did not give us enough information to understand what those terms mean. That makes it difficult, if not impossible, for us to assess whether their inclusion in [the plaintiff]'s RFC is supported by substantial evidence. The Commissioner contends that "production rate" and "demand pace" are common vocationally relevant functional limitations. But those terms appear in a vanishingly small number of Social Security cases involving RFC evaluations. Of the cases in which the terms do appear, several originated with the same ALJ as the one who denied [the plaintiff]'s application. We therefore disagree with the Commissioner: the terms do not seem to be especially common — certainly not common enough for us to know what they mean without elaboration.

Combined, the above-listed missteps in the ALJ's RFC evaluation frustrate our ability to conduct meaningful appellate review, requiring us to vacate and remand.

Thomas, 916 F.3d at 312 (emphasis added) (internal citations, quotation marks, brackets, and ellipses omitted). For the reasons discussed below, none of the four "missteps" identified in Thomas exists in this case, thus providing no basis for remand.

a. Ability to Perform Job-Related Tasks for a Full Workday

Plaintiff maintains that, although "the mental RFC mentions that [Plaintiff] would be 'off task no more than ten percent of the time in an eight-hour workday, in addition to normal breaks,' the ALJ still fail[ed] to explicitly conclude how [Plaintiff]'s mental limitations would affect his ability to perform job-related tasks for a full workday." (Docket Entry 13 at 12 (internal citation omitted) (quoting Tr. 15).) Plaintiff further faults the ALJ for 1) contradicting himself by first finding that Plaintiff's mental symptoms remained in "'generally good control with conservative

11

treatment'" (id. (quoting Tr. 16)), but then later noting that, "'[d]espite the lack of ongoing treatment, there was no evidence [Plaintiff] experienced symptom exacerbations'" (id. (quoting Tr. 17)), and 2) "fail[ing] to relate the mental limitations – from [s]tate agency consultants . . . whose mental RFC's [sic] the ALJ found 'persuasive' – to the ability to perform functions through a full workday" (id. (quoting Tr. 17, and citing Tr. 114, 119, 135)). None of those contentions carry the day.

As Plaintiff concedes (see Docket Entry 13 at 12), the ALJ expressly found in the RFC that, despite Plaintiff's severe depressive disorder (see Tr. 13), he "would be off task no more than ten percent of the time in an eight-hour workday, in addition to normal breaks" (Tr. 15 (emphasis added)). That finding fully complies with the Commissioner's policies, see Social Security Ruling 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, at *2 (July 2, 1996) ("SSR 96-8p") (defining RFC as an "individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," in turn meaning "8 hours a day, for 5 days a week, or an equivalent work schedule" (emphasis added)), and Fourth Circuit decisions in Mascio v. Colvin, 780 F.3d 632, 637 (4th Cir. 2015) (remanding, in part, because ALJ "said nothing about [the

claimant's] ability to perform [job-related functions] for a full workday"), and Thomas.

Indeed, the Fourth Circuit in Thomas clarified that, "[o]n remand, the ALJ will need to establish for how long, and under what conditions, [the plaintiff] is able 'to focus [his] attention on work activities and stay on task at a sustained rate[,]' 20 C.F.R. [] Pt. 404, Subpt. P, App. 1 § 12.00E(3)[, and o]nly then will we or any court be able to meaningfully review the ALJ's RFC finding." Thomas, 916 F.3d at 312 n.5 (emphasis added). The ALJ here, by finding that Plaintiff would remain off-task no more than ten percent of an eight-hour workday (see Tr. 15), necessarily also found that Plaintiff could stay on-task for at least 90 percent of an eight-hour workday, excluding normal breaks, which translates to at least six hours and eighteen minutes, i.e., the ALJ established "'how long . . . [Plaintiff wa]s able to focus [his] attention on work activities and stay on task at a sustained rate,'" id. (quoting 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00E.3) (emphasis added). The ALJ also limited Plaintiff to SRRTs, simple work-related decisions, occasional interaction with the public, and frequent interaction with co-workers and supervisors. (See Tr. 15.) Thus, the ALJ determined "'under what conditions, [the plaintiff] is able 'to focus [his] attention on work activities and stay on task at a sustained rate,'" id. (quoting 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00E.3) (emphasis added). Neither Fourth

13

Circuit precedent nor the Commissioner's regulations and policies require more from the ALJ.

Plaintiff's assertion that the ALJ contradicted himself by first finding that Plaintiff's mental symptoms remained in "'generally good control with conservative treatment'" (Docket Entry 13 at 12 (quoting Tr. 16)), but then later noting that, "'[d]espite the lack of ongoing treatment, there was no evidence [Plaintiff] experienced symptom exacerbations'" (id. (quoting Tr. 17); see also id. (arguing that "[t]he ALJ cannot on the one hand argue that treatment was effective and, on the other hand, that there was a lack of treatment without symptom exacerbation") fares no better. As the Commissioner pointed out, "[m]ental health treatment records showed that Plaintiff responded to conservative treatment through February 2017" (Docket Entry 15 at 11 (citing Tr. 16-17, 626-27)) and, "[a]fterwards, Plaintiff had no further mental health treatment, but 'there was no evidence [that he] experienced symptom exacerbations'" (id. (quoting Tr. 17)). In other words, the ALJ's observations in question referred to two different time periods in Plaintiff's treatment history and thus do not conflict with one another.

Plaintiff additionally contends that the ALJ did not "relate" the state agency psychological consultants' opinions that Plaintiff "'d[id] not handle stress well'" (Docket Entry 13 at 12 (quoting Tr. 114)), that "his ability to handle changes varie[d]" (id.

(quoting Tr. 114)), and that he required "a stable, low stress work assignment" (id. at 13 (quoting Tr. 135)) to "the ability to perform functions through a full workday" (id.). As an initial matter, the initial-level consultant's statement that Plaintiff "does not handle stress well but his ability to handle changes varies" (Tr. 114) does not constitute the consultant's opinion but rather her recitation of Plaintiff's statements on a Function Report (compare Tr. 114, with Tr. 298), and that consultant found Plaintiff's statements only "partially consistent with the objective evidence and functional information" (Tr. 114). Significantly, both consultants found that Plaintiff retained the mental RFC to perform SRRTs, which necessarily constitutes a finding that he can perform them throughout an eight-hour day. (See Tr. 117 ("The questions below help determine [Plaintiff's] ability to perform sustained work activities." (emphasis added).)

Moreover, Plaintiff does not make any argument as to why the ALJ's limitations to SRRTs not involving a production rate pace and involving simple, work-related decisions, limited interaction with others, as well as an allowance to remain off-task for up to ten percent of the workday (see Tr. 15), fail to address Plaintiff's abilities throughout a workday (or otherwise do not adequately address the reconsideration-level consultant's opinion that Plaintiff required a stable, low-stress work assignment (see Tr. 135). That failure precludes relief. See United States v.

15

Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (internal quotation marks omitted)); Hughes v. B/E Aerospace, Inc., No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) (unpublished) (Schroeder, J.) ("A party should not expect a court to do the work that it elected not to do.").

b.  Weighing of Mental Health Evidence

Plaintiff next asserts that, like in Thomas, the ALJ here "failed to offer an intelligible explanation for the weight of mental health treatment records when he, on the one hand, contend[ed] there was 'good control with conservative treatment,' but on the other hand, there was a 'lack of ongoing treatment.'" (Docket Entry 13 at 13 (quoting Tr. 16-17).)  As discussed above, that argument lacks merit, as the ALJ's statements in question referred to two different times in Plaintiff's treatment history, one during which he received mental health treatment, and one in which he did not.

Plaintiff additionally faults the ALJ for "disregard[ing]" a clinical assessment at Freedom House Recovery Center "dated August 12, 2016 [sic]" because it predated Plaintiff's protected SSI filing date (and amended alleged onset date) of March 30, 2017. (Docket Entry 13 at 13 (citing Tr. 17, and referencing Tr. 1222-

46).)[6]  Plaintiff's argument fails, because the ALJ expressly acknowledged that Plaintiff "received sporadic treatment at Freedom House with records indicating generally good control with conservative treatment." (Tr. 16 (emphasis added).) Moreover, the ALJ pointed out the incorrect date of the evaluation, not as a basis for disregarding it, but in order to support his accurate statement immediately prior that the record "contained no further [mental] treatment notes" after February 2017. (Tr. 17 (citing Tr. 1245).)

c.  Determining RFC Before Analyzing the Evidence

Continuing his Thomas comparison, Plaintiff argues that "[t]he ALJ in [Plaintiff]'s case d[id] precisely what the ALJ in Thomas did: he propound[ed] the RFC before concluding that the limitations caused by the impairments were consistent with the RFC." (Docket Entry 13 at 14 (emphasis added) (citing Tr. 14-16).) The Fourth Circuit has made clear that the error consists of "expressing [a claimant]'s RFC first and only then concluding that the limitations caused by [the claimant]'s impairments were consistent with that RFC." Monroe v. Colvin, 826 F.3d 176, 188 (4th Cir. 2016) (first emphasis in original, second emphasis added); see also Mascio, 780

_____

[6] Two copies of the evaluation in question exist in the record (see Tr. 652-73, 1222-46), and both of them bear the date of August 1, 2016, on the pages reflecting the clinician's signature (see Tr.672-73, 1245-46). Only the second, duplicate copy of the treatment record in question contains the header "Assessment Date: 8/1/17" on each of its pages (see Tr. 1222-46), which appears to constitute a typographical error, given the date of signature by the clinician (see Tr. 1245-46).

F.3d at 636.  Here, the ALJ did not commit that error, because he did not make any statement that Plaintiff's limitations "were consistent with the RFC" (see Tr. 15-18), nor does Plaintiff point to any other evidence that the ALJ determined the RFC prior to analyzing the evidence (see Docket Entry 13).

d.  Production Rate or Demand Pace

Lastly, Plaintiff maintains that this case analogizes to Thomas because the ALJ "did not define at any point in the decision what he meant by 'production rate pace.'" (Docket Entry 13 at 15 (quoting Tr. 15).)  The Fourth Circuit held in Thomas that the ALJ's use of the phrase "production rate or demand pace" failed to provide the court with "enough information to understand what those terms mean[t]."  Thomas, 916 F.3d at 312.  The ALJ here, however, did not use the phrase "production rate or demand pace" but, rather, precluded work "not at a production rate pace."  (Tr. 15.) That distinction matters, as the phrase "production rate pace" appears in the definition of light work in the Dictionary of Occupational Titles ("DOT"):

> [A] job should be rated [l]ight [w]ork . . . when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.  NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.

18

DOT, App'x C ("Components of the Definition Trailer"), § IV ("Physical Demands - Strength Rating"), 1991 WL 688702 (emphasis added).

Moreover, as another judge of this Court recently reasoned:

> In [Perry v. Berryhill, 765 F. App'x 869 (4th Cir. 2019)], the Fourth Circuit found fault with "the ALJ's reference to a 'non-production oriented work setting,'" as the Fourth Circuit "d[id] not know what the ALJ intended when she used that phrase," making it "difficult, if not impossible, to evaluate whether restricting [the plaintiff] to a 'non-production oriented work setting' properly accounted for [his] well-documented limitations in concentration, persistence, or pace." Perry, 765 F. App'x at 872. In so doing, the Fourth Circuit specifically distinguished its decision in Sizemore v. Berryhill, 878 F.2d 72 (4th Cir. 2017), where it "found that an ALJ had adequately explained a[n RFC] assessment that restricted the claimant, in part, to 'non-production jobs,'" as "the ALJ in Sizemore provided additional context, explaining that the claimant could perform work only in a 'low stress' setting, without any 'fast-paced work' or 'public contact,' to account for moderate limitations in concentration, persistence, or pace," which "descriptors helped to explain the restriction intended by the ALJ, and allowed [the Fourth Circuit] to evaluate whether that restriction adequately accounted for the claimant's limitations." Perry, 765 F. App'x at 872 n.1.

Ross v. Berryhill, No. 1:17CV1145, 2019 WL 1430129, at *1 (M.D.N.C. Mar. 29, 2019) (unpublished) (Schroeder, C.J.) (emphasis added). As in Ross (and consistent with Sizemore, as construed in Perry), the ALJ here provided the further descriptors of "simple work-related decisions," "occasional interaction with the public," and "frequent interaction with co-workers and supervisors"(Tr. 15). Those descriptors "help[ ] to explain the restriction intended by the ALJ." Perry, 765 F. App'x at 872 n.1; see also Beckstrom v.

19

Saul, No. 1:19CV746, 2020 WL 1929021, at * (M.D.N.C. Apr. 21, 2020) (unpublished) (finding ALJ's definition of "not at a production rate pace" as meaning no "assembly line work," along with further descriptors of "simple work-related decisions" and only "occasional[ ] interact[ion] with supervisors, coworkers, and the public" allowed for meaningful judicial review), recommendation adopted, slip op. (M.D.N.C. May 15, 2020) (Eagles, J.).

Furthermore, at the hearing before the ALJ, Plaintiff failed to question the VE regarding the meaning of the phrase "production rate pace" or how the jobs the VE cited adhered to that restriction, despite the fact that he had the opportunity (through his attorney) to cross-examine the VE. (See Tr. 78.) Similarly, the VE did not express any difficulty in understanding the meaning of the words "production rate pace" in responding to the ALJ's dispositive hypothetical question. (Tr. 76.)

In light of the foregoing analysis, Plaintiff has failed to demonstrate prejudicial error under Thomas, and his first assignment of error falls short.

### 2. Time Off-Task

In Plaintiff's second issue on review, he maintains that "[t]he ALJ erred in finding that [Plaintiff] would be off task no more than 'ten percent of the time in an eight-hour workday, in addition to normal breaks,' because the ALJ fail[ed] to explain what evidence support[ed] the off task limitation to no more than

20

ten percent of the time." (Docket Entry 13 at 15.) According to Plaintiff, "[c]ourts within the Fourth Circuit have concluded 'that the ALJ's failure to explain the determination that a claimant would be off task for a certain percentage of time left the court unable to conduct a meaningful review of whether the determination was supported by substantial evidence.'" (Id. (quoting Marshall v. Saul, No. 5:20CV55, 2020 WL 7390486, at *5 (E.D.N.C. Nov. 19, 2020) (unpublished), recommendation adopted, 2020 WL 7388433 (E.D.N.C. Dec. 16, 2020) (unpublished), and citing Gragg v. Saul, No. 1:19CV129, 2020 WL 3259177, at *4 (W.D.N.C. June 16, 2020) (unpublished), and Richardson v. Saul, No. 4:19CV128, 2020 WL 3816317, at *6 (E.D.N.C. June 9, 2020) (unpublished), recommendation adopted, 2020 WL 3799344 (E.D.N.C. July 7, 2020) (unpublished)).) Plaintiff maintains that the ALJ's error in that regard "is not harmless because, had [Plaintiff] required more than ten percent of the work day off task, the VE may very well have testified that competitive work would be excluded." (Id. at 16 (citing Patricia W. v. Berryhill, No. 1:19CV9, 2019 WL 6790512, at *3 (D. Md. Dec. 12, 2019) (unpublished)).) Plaintiff's contentions miss the mark.

In the cases cited above, the courts could not discern the basis for the ALJ's time off-task limitation. See Marshall, 2020 WL 7390486, at *5 ("Nowhere in the decision does the ALJ explain how she arrived at the 10% figure, there is no opinion evidence in

the administrative record to support the finding, and the Commissioner does not address the issue."); Gragg, 2020 WL 3259177, at *4 (finding that ALJ "failed to . . . explain his conclusion that the claimant would be off-task nine percent of the time" and noting that, "in the absence of explanation, the [c]ourt is left to pontificate on where the ALJ came up with the nine-percent figure" (internal quotation marks and brackets omitted) (emphasis added)); Richardson, 2020 WL 3816317, at *6 ("[T]here is no 'logical bridge' between the evidence and the conclusion that [the plaintiff] would be off task up to nine percent of the workday[.]" (emphasis added)); Patricia W, 2019 WL 6790512, at *3 ("[T]he ALJ failed to explain how he reached the conclusion of 10%[, and t]his [c]ourt is not in a position to determine, in the first instance, whether [the p]laintiff would be off-task 10%, 15%, 5% or 13% of the time."). Notably, in two of the above-cited cases, the ALJ found that the claimant would remain off-task nine percent of an eight-hour workday, a precise number which fell below what the VE deemed work-preclusive, see Gragg, 2020 WL 3259177, at *4; Richardson, 2020 WL 3816317, at *7 n.2 (noting "curious nature of the off-task figure" of nine percent); see also Lovato v. Berryhill, No. 6:16CV46, 2017 WL 2371096, at *4 (D. Or. May 9, 2017) (unpublished) ("[T]he [c]ourt is unable to discern what substantial evidence supported the ALJ's conclusion that [the] plaintiff would be off task 9% of the time, beyond the VE's testimony that a larger

percentage would necessitate a finding of disability."), recommendation adopted, 2017 WL 2369377 (D. Or. May 31, 2017) (unpublished).

Here, in contrast, the ALJ did not assign an unusual percentage of time Plaintiff would remain off-task, instead finding that he "would be off task no more than ten percent of the time in an eight-hour workday." (Tr. 15 (emphasis added).) In other words, the ALJ found that Plaintiff's depressive disorder caused some limitation in Plaintiff's ability to remain on-task but not disabling limitations. (See id.; see also Tr. 17 ("[T]he record documents that [Plaintiff] suffers from . . . mental impairments[] which . . . do cause certain limitations[; h]owever, the record does not establish that [Plaintiff]'s limitations are disabling.").) That determination coheres with the ALJ's other findings that A) Plaintiff suffered from severe depressive disorder (see Tr. 13), B) he had a moderate (not marked) deficit in his ability to maintain concentration, persistence, or pace (see Tr. 14), C) his "statements concerning the intensity, persistence and limiting effects of [his] symptoms," including his testimony that his "depression inhibited his ability to sustain focus" (Tr. 15; see also Tr. 62-63), "[we]re not entirely consistent with the medical evidence and other evidence in the record" (Tr. 15-16), and D) his "[m]ental status examinations . . . indicated a normal mood with cooperative behavior and intact memory skills, attention span,

23

insight, and judgment" (Tr. 17). Under such circumstances, the Court can trace the path of the ALJ's reasoning for finding Plaintiff would remain off-task for up to ten percent of a workday. See Link v. Saul, No. 1:19CV662, 2020 WL 5044038, at *9 (M.D.N.C. Aug. 26, 2020) (unpublished) (holding that ALJ's findings at step two of SEP, analysis of Plaintiff's subjective symptom reporting, and evaluation of objective evidence "adequately explained the RFC's allowance for [the p]laintiff to remain off-task for up to 10 percent of the workday in addition to normal breaks"), recommendation adopted, slip op. (M.D.N.C. Sept. 10, 2020) (Biggs, J.).

Under these circumstances, the Court should deny relief on Plaintiff's challenge to the ALJ's evaluation of Plaintiff's ability to remain on-task.

### 3. Opinions of Dr. Edward Forero[7]

Plaintiff lastly contends that the ALJ erred in his evaluation of the opinions of consultative medical examiner Dr. Edward Forero. (See Docket Entry 13 at 18-22.) More specifically, Plaintiff challenges the AlJ's findings that Dr. Forero's opinions 1) lacked internal consistency (see id. at 18-19), 2) qualified as unreasonable in light of Dr. Forero's other moderate limitations

---

[7] Plaintiff's third issue on review nominally contends that "[t]he ALJ err[ed] by failing to make a function-by-function assessment of [Plaintiff]'s functioning before finding [RFC]." (Docket Entry 13 at 17.) Plaintiff's argument that follows, however, focuses on various challenges to the ALJ's evaluation of the opinions of consultative medical examiner Dr. Edward Forero. (See id. at 18-22.)

(id. at 19-20), and 3) "'indicate[d] the need for greater treatment than present in the record . . . and [we]re not consistent with the overall evidence of record'" (id. at 20 (quoting Tr. 18)). None of those arguments warrants remand.

Dr. Forero examined Plaintiff on July 20, 2017 (see Tr. 674-77), and noted that, although "well appearing" and "well nourished," Plaintiff appeared "in distress when standing or walking" (Tr. 676) and ambulated slowly with an antalgic, unsteady gait (see Tr. 677). Dr. Forero additionally observed that Plaintiff had moderate difficulty arising from a chair and getting on and off the examination table (see Tr. 676), could not heel walk, toe walk, or tandem walk without difficulty (see id.), and could not squat (see Tr. 677). Although Dr. Forero found non-pathologic reflexes, intact pulses, no edema, and no tenderness in Plaintiff's lumbar spine, Dr. Forero did document 2/5 sensation and 2/5 strength in the left lower extremity, positive straight leg raising test on the left at 45 degrees in the supine position, and atrophy in the left leg. (See id.) As a result of those findings, Dr. Forero opined that Plaintiff "d[id] not need [an] assistive device for ambulation[,] . . . [wa]s unable to walk a block at a reasonable pace on a rough/uneven surface[, and] . . . [wa]s unable to climb a few steps at a reasonable pace with the use of a single handrail." (Id.) Dr. Forero further concluded that Plaintiff's "ability to handle objects, hear and speak [wa]s not impaired" and

25

that his "ability to sit, <u>stand, move about</u>, lift, carry, travel and stamina [wa]s <u>moderately</u> impaired." (<u>Id.</u> (emphasis added).)

The ALJ evaluated and weighed Dr. Forero's opinions as follows:

> In June 2017, Dr. Forero opined [Plaintiff] was unable to walk a block at a reasonable pace and could not climb stairs. However, he also opined [Plaintiff] did not require an assistive device for ambulation and does have full use of the other upper extremity for carrying objects. He also opined that [Plaintiff]'s abilities to handle objects, hear and speak were not impaired, and [Plaintiff]'s abilities to sit, stand, move about, lift, carry, travel, and stamina were moderately impaired. The [ALJ] does not find Dr. Forero's opinion persuasive. While Dr. Forero conducted a thorough examination, he did not explain his limitations, and his limitations are internally inconsistent. An inability to walk a block at a reasonable pace or climb stairs is not consistent with Dr. Forero's otherwise moderate limitations and reasonably suggests the need for an ambulatory aide [sic]. However, Dr. Forero specifically stated [Plaintiff] did not require one. Furthermore, such extreme limitations would indicate the need for greater treatment than present in the record, which included only primary care medication management, and are not consistent with the overall evidence of record, as described herein. Of note, in May 2017 [Plaintiff] told his primary care provider that he was feeling much better physically and mentally. While he continued to have back pain, his medications were helpful. He appeared well, in no distress, and was walking without an assistive device. His physical exam was essentially normal.

(Tr. 17-18 (internal parenthetical citation omitted).)[8]

---

[8] For benefits applications filed on or after March 27, 2017 (such as Plaintiff's (<u>see</u> Tr. 233-38)), the SSA has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. <u>See</u> Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017). Under the new regulations, ALJs are no longer required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. <u>See</u> 20 C.F.R. § 416.920c(a) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including
(continued...)

26

Plaintiff first challenges the ALJ's statement that Dr. Forero's "limitations [we]re internally inconsistent," because "[a]n inability to walk a block at a reasonable pace or climb stairs . . . reasonably suggests the need for an ambulatory aide [sic]," but "Dr. Forero specifically stated [Plaintiff] did not require one" (Tr. 17-18). (See Docket Entry 13 at 18-19.) According to Plaintiff, "[e]xamples of ineffective ambulation [under the regulations] include 'the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable place on rough or uneven surfaces[, and the] inability to climb a few steps at a reasonable pace with the use of a single hand rail.'" (Id. at 19 (quoting 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.00B2(b)(2)).) Plaintiff points out that "[t]h[o]se discrete examples are not connected with the conjunctive 'and,' and consequently each may be sufficient to establish ineffective ambulation" and thus "the inability to walk

---

[8] (...continued)
those from [a claimant's] medical sources"). Instead, an ALJ must determine and "articulate in [the] . . . decision how <u>persuasive</u> [he or she] find[s] all of the medical opinions and all of the prior administrative medical findings in [a claimant's] case record." 20 C.F.R. § 416.920c(b) (emphasis added). In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors" and thus the ALJ must address those two factors in evaluating the persuasiveness of an opinion or a finding. 20 C.F.R. § 416.920c(b)(2). The ALJ must only address the three other persuasiveness factors — the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict" the opinion/finding, 20 C.F.R. § 416.920c(c)(3)-(5) — when the ALJ finds two or more opinions or findings about the same issue "[e]qually persuasive" in terms of supportability and consistency, 20 C.F.R. § 416.920c(b)(3).

a block or inability to climb a few steps does not necessarily suggest the need for an ambulatory aid." (Id.)

Plaintiff's reliance on the regulatory definition of "inability to ambulate effectively" actually underscores the appropriateness of the ALJ's remark in question. The regulations define "[i]neffective ambulation" as "an <u>extreme</u> limitation of the ability to walk" and as "having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device <u>that limits the functioning of both upper extremities</u>," 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.00B2(b)(1) (emphasis added), i.e., "a walker, two crutches or <u>two canes</u>," <u>id.</u>, § 1.00B2(b)(2) (emphasis added). Thus, the fact that Dr. Forero opined that Plaintiff met <u>two</u> of the provided examples of ineffective ambulation (<u>compare</u> Tr. 677, <u>with</u> 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.00B2(b)(2)), strongly suggested that he would require <u>at least one</u> hand-held assistive device that would limit the functioning of <u>one</u> upper extremity.

Next, Plaintiff objects to the ALJ's finding that Dr. Forero's "limitations [we]re internally inconsistent," because "[a]n inability to walk a block at a reasonable pace or climb stairs [wa]s not consistent with Dr. Forero's otherwise moderate limitations" (Tr. 17-18). (<u>See</u> Docket Entry 13 at 19-20.) Plaintiff posits that "the Commissioner's rules" define "[m]oderate [to] mean[] that [P]laintiff's 'capacity to perform the activity is

28

impaired'" (id. at 19 (quoting Program Operations Manual System ("POMS") § DI 24510.063B.2)), which "definition does not exclude the ability or inability to perform an activity" (id. at 19-20) but "states only that the capacity is impaired" (id. at 20).

As the Commissioner argues, however, the POMS section upon which Plaintiff relies "provides instructions for [s]tate agency . . . psychological consultants when completing the mental RFC assessment during the initial stages of administrative review" (Docket Entry 15 at 21 (emphasis in original)) and "has no relevance to whether the ALJ drew reasonable inferences from Dr. Fo[r]ero's [opinions]" (id. at 22). Moreover, Dr. Forero's opinions that Plaintiff could not walk a block at a reasonable pace on rough or uneven surfaces and could not climb a few steps at a reasonable pace using a single hand rail (see Tr. 677) qualify as "extreme limitation[s] of [Plaintiff's] ability to walk," 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.00B2(b)(1) (emphasis added). Accordingly, the ALJ did not err by finding an internal inconsistency between such extreme limitations and Dr. Forero's other opinion that Plaintiff's "ability to sit, stand, move about, lift, carry, travel and stamina [wa]s moderately impaired" (Tr. 677 (emphasis added). (Tr. 17-18.)

Lastly, Plaintiff contests the ALJ's rationale that Dr. Forero's "extreme limitations would indicate the need for greater treatment than present in the record, which included only primary

29

care medication management, and are not consistent with the overall evidence of record" (Tr. 18). (See Docket Entry 13 at 20-21.) Plaintiff disputes "that treatment with primary care medication management is inconsistent with a patient's inability to ambulate effectively," and notes that "[t]he only support the ALJ offers for an inconsistency between the inability to ambulate effectively and the 'overall evidence of record as described herein' is a single May 2017 note that showed [Plaintiff] was feeling 'much better physically and mentally,' although he was continuing to have back pain." (Id. at 20 (quoting Tr. 18, and referencing Tr. 790-94).) According to Plaintiff, the "citation of a single note [] is obviously cherry-picking in the extreme because the remainder of the record consists predominantly of references to symptoms and signs not inconsistent with an inability to ambulate effectively." (Id. (citing Tr. 365, 477, 516, 556, 560, 562, 675-77, 717-18, 934, 986).) Plaintiff contends that, "[h]ad the ALJ considered properly all the evidence of [Plaintiff]'s inability to ambulate effectively, he may have credited an RFC limited to sedentary work" and, "as of the date of the [ALJ's] decision" (id. at 21), the [M]edical[-V]ocational [R]ules [would have] direct[ed] a decision of disabled" (id. at 22 (citing 20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 201.09)). Those contentions do not establish prejudicial error by the ALJ.

30

Notably, Plaintiff does not challenge the ALJ's observation that Plaintiff's treatment consisted of "primary care medication management" (Tr. 18). (See Docket Entry 13 at 20-22.) Moreover, as the Fourth Circuit has recognized, "'in determining if someone is disabled, it is appropriate to consider such things as[ t]he type, dosage, effectiveness, and side effects of any medication [a claimant] take[s] or ha[s] taken to alleviate [his or her] pain or other symptoms[, and t]reatment, other than medication, [a claimant] receive[s] or ha[s] received for relief of [his or her] pain or other symptoms[.]'" Dunn v. Colvin, 607 F. App'x 264, 273 (4th Cir. 2015) (quoting 20 C.F.R. § 404.1529(c)(3)(iv)-(v)). Thus, "inasmuch as the ALJ is allowed to consider the nature of [the plaintiff]'s treatment in determining whether []he is disabled, a reasonable mind might agree that the conservative nature of [the plaintiff]'s treatment is an adequate basis to support the ALJ's conclusion." Id.

Regarding Plaintiff's allegation of "cherry-picking" (Docket Entry 13 at 20), as the Commissioner argues, beyond a citation to Dr. Forero's opinions, "[a]ll of Plaintiff's other citations pre-date the [amended] alleged onset date" of March 30, 2017 (Docket Entry 15 at 22). (See Docket Entry 13 at 20-21 (citing Tr. 365 (February 18, 2015), 477 (February 25, 2014), 516 (July 3, 2014), 556 (July 17, 2016), 560 (July 25, 2016), 562 (July 25, 2016), 717-18 (June 16, 2015), 934 (June 16, 2015), 986 (July 20, 2016)).)

31

The ALJ's discussion of the medical evidence during the relevant period (see Tr. 16-17), including consistently unremarkable findings on examination (see Tr. 16 (citing Tr. 794, 827-28, 869-70, 1919-20)), supports the ALJ's observation regarding the inconsistency of Dr. Forero's extreme limitations with the overall record (see Tr. 18).

In sum, Plaintiff's third and final assignment of error fails as a matter of law.

### III. CONCLUSION

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 12) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 14) be granted, and that this action be dismissed with prejudice.

                          /s/ L. Patrick Auld
                       **L. Patrick Auld**
                **United States Magistrate Judge**

July 21, 2021

32